Case 08-18196    Filed 06/18/09    Doc 45
FILED
JUN 1 8 2009
UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

POSTED ON WEBSITE

## NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| In re | Case No. 08-18196-B-7 |
| Kathleen Andersen, | DC No. UST-1 |
|       Debtor. | |

**MEMORANDUM DECISION REGARDING UNITED STATES TRUSTEE'S MOTION TO DISMISS**

This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case or the rules of res judicata and claim preclusion.

Gregory S. Powell, Esq., appeared on behalf of Sara L. Kistler, Esq., Acting U.S. Trustee.

Thomas P. Hogan, Esq., appeared on behalf of the debtor, Kathleen Andersen.

      The United States Trustee ("UST") disputes certain deductions claimed by the debtor, Kathleen Andersen ("Debtor") on her Amended Form 22A (the "Means Test"). Based thereon, the UST moves to dismiss this case as a presumed abuse of chapter 7 pursuant to 11 U.S.C. § 707(b)(2).[1] In the alternative, the UST contends that the Debtor has the ability to repay a substantial portion of her debts through a chapter 13 plan and asks that the case be dismissed as an abuse of chapter 7 based on the totality of the circumstances of the Debtor's financial situation pursuant to § 707(b)(3) (the "Motion"). The Debtor disputes both arguments and denies, after multiple attempts to amend her

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036, as enacted and promulgated *after* October 17, 2005, the effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, Apr. 20, 2005, 119 Stat. 23 (hereafter "BAPCPA").



Means Test and her statement of income and expenses, that she has the ability to repay any of her unsecured debts. She further contends that all of her unsecured debts should be paid by her former spouse, that she is supporting two children, and that her living expenses consume all of her income. For the reasons set forth below, the UST's Motion will be granted.

This memorandum decision contains the court's findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a), made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 7052. The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, 11 U.S.C. § 707, and General Orders 182 and 330 of the U.S. District Court for the Eastern District of California. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A).

**Background and Findings of Fact.**

The Debtor has been employed for 25 years as a teacher with the Merced City School District. She is a single parent with two children, ages 17 and 20 years. The Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on December 15, 2008. She is an individual with primarily consumer debts. Her scheduled unsecured debts total $60,284 and her scheduled secured debts total $38,539.94. The Debtor does not own any real property, but she does own three automobiles: a 1999 Chrysler valued at $5,000; a 1996 Pontiac Grand Am valued at $3,000; and a 2006 Mustang valued at $18,475 (the "Mustang").

The Debtor's Schedules. The Debtor's schedule D lists only three secured creditors: AIG VALIC, for a retirement plan loan in the amount of $515.94; a debt for a "time share" interest in CFI Resorts in the amount of $14,000 ("Time Share"); and a debt to the Merced School Employees' Credit Union (the "Credit Union") in the amount of $24,024, secured by the Mustang. Based on the Debtor's statement of intention filed with the petition, she intends to surrender the Time Share which will eliminate $14,000 of the

secured debt. The Debtor also intends to reaffirm the debt secured by the Mustang[2] and will presumably repay the retirement loan.

In her initial response to the Motion, the Debtor lodged a copy of her employee's Statement of Earnings and Deductions ("Earnings Statement") for the month of December 2007 and a copy of her 2007 federal income tax return (the "2007 Tax Return").[3] The Earnings Statement shows, *inter alia*, that the Debtor's gross income in 2007 was $7,425.45 per month. It also shows two voluntary payroll deductions; one labeled "TSA TDS" in the amount of $200 and one to the Credit Union (labeled "CU DED") in the amount of $680 per month (the "Credit Union Deduction"). In her 2007 Tax Return, the Debtor only claimed one dependent, her 20-year old daughter.

The Debtor's statement of income, schedule I, states that she has two dependents, a son age 17 and a daughter age 20. Schedule I reports a gross prepetition income of $7,666.36 per month with a net income, after payroll deductions, of $4,862.75. The Debtor itemized several deductions from her gross income including payroll taxes, social security, insurance, and union dues. Consistent with her Earnings Statement, the Debtor deducted $200 per month for "TSA TDS" for which there is no explanation as to the necessity or reasonableness of the expense. She also listed the $680 Credit Union

---

[2]The reaffirmation agreement was filed on January 5, 2009.

[3]After oral argument on the Motion, the court sua sponte struck the Debtor's original opposition brief because the documents included social security numbers for the Debtor and her minor child, and confidential identifying information, which should have been redacted by the Debtor before the documents were filed pursuant to Federal Rule of Bankruptcy Procedure 9037(a). The court ordered the Debtor to file a "corrected" opposition brief. In response, the Debtor filed a totally new opposition brief with a new analysis of the Debtor's income and expenses, but without the Earnings Statement and the 2007 Tax Return. The new opposition brief included amended, but unverified schedules I and J, which show a monthly net income of negative $431,30, and yet another amended Means Test, which shows a disposable income of negative $1,148.58. The Debtor states in a supplemental declaration that the fourth Means Test is based on "a thorough analysis of my pay stubs and other supporting information." She offers no explanation for failing to do this "thorough analysis" when she prepared the original Means Test. The Debtor's new opposition brief was non-responsive to the court's order to file a "corrected" document and it has not been considered by the court.

Deduction." Based on the court's examination of the record, and the lack of any explanation for this deduction, the court concludes that this voluntary payment to the Credit Union includes payment of the debt secured by the Mustang. No other reason appears in the schedules for the Debtor to be making any payment to the Credit Union.

On February 13, 2009, the Debtor filed an amended schedule J listing her average monthly expenses as $4,667.71, resulting in a monthly net income of $195.04. These expenses include $1,250 for "rent," $100 for "water and sewer," $150 for "telephone service," $90 for "yard care," $70 for "home maintenance" (even though the Debtor does not own a home), $900 for "food" (for the Debtor and one dependent), $100 for "clothing," $85 for "laundry and dry cleaning," $300 for transportation expense (not including the car payment and insurance), $150 for "recreation," and $150 for "school supplies."[4] In addition, the Debtor deducted $487 for "car payments." This amount is identical to the monthly payment listed in the Debtor's reaffirmation agreement with the Credit Union for the Mustang. It appears that the Debtor has taken two deductions for the car payment to the Credit Union, the $680 Credit Union Deduction on schedule I and $487 as an automobile payment on schedule J.

The Means Test. The Debtor filed her initial Means Test, Form 22A, with the petition. That document showed a monthly disposable income (line 50) of $153.14. The Debtor filed an Amended Means Test on February 13, 2009. That document reduced the Debtor's monthly disposable income to $120.71. After the UST filed this Motion, the Debtor filed a third Means Test on March 13, 2009. For purposes of this ruling, the court has considered only the third Means Test and the latest schedules I and J, however, the Debtor's multiple attempts to amend those documents raises a significant question as to the inherent reliability of the information contained in those documents.

The Debtor's current monthly income ("CMI"), for purposes of calculating the

---

[4] The fact that the Debtor's living expenses are all stated in even round numbers suggests that they are estimates, and not based on actual payment records.

4

§ 707(b)(7) exclusion, is listed on line 11 of the third Means Test as $6,448.47. Thus, the Debtor's annualized income (CMI x 12) is $77,381.64, which exceeds the applicable median income for the Debtor's family. For this reason, the allowable deductions from the Debtor's CMI are calculated pursuant to the statutory formula set forth in § 707(b)(2).

On March 4, 2009, the UST filed the Motion taking exception to many of the deductions claimed by the Debtor on her second Means Test. The UST noted five errors, two of which resulted in increased deductions for the Debtor, and three of which resulted in decreased deductions for the Debtor. In addition, the UST determined the Debtor could be entitled to two deductions not claimed on the amended Means Test. The UST argued that the Debtor was only entitled to deductions totaling $5,691. In response, the Debtor filed the third Means Test and substantially increased her monthly deductions from $6,327.76 (second Means Test) to $7,255.72. The Debtor's third Means Test calculates her monthly disposable income to be *negative* $807.25.

**Analysis and Conclusions of Law.**

Overview of § 707(b). The chapter 7 case of an individual debtor whose debts are primarily consumer debts may be dismissed under § 707(b)(1) if the court finds, after notice and a hearing, that the granting of a discharge would be an abuse of chapter 7. BAPCPA offers two standards for determining the "abuse" issue. Abuse may be presumed under the objective test prescribed in § 707(b)(2),[5] the Means Test. The function of the Means Test is to estimate the ability of chapter 7 debtors to repay their debts. If the debtor's annualized income exceeds the applicable median family income, and the Means Test shows that the debtor has the ability to repay the lesser of 25% of the

---

[5]Section 707(b)(2)(A)(I) states in pertinent part:

"[T]he court shall presume abuse exists if the debtor's current monthly income reduced by the [allowed deductions] . . . and multiplied by 60 is not less than the lesser of–
    (I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $6,575, whichever is greater; or–
    (II) $10,950."

nonpriority unsecured claims, or $10,950, over a period of five years, then a presumption of abuse arises. Section 707(b)(2)(A) prescribes a comprehensive list of allowable expenses for making that determination.

Section 707(b)(3) offers a more subjective test for abuse based on the debtor's good faith and the "totality of the circumstances . . . of the debtor's financial situation . . . ."[6] Unlike the Means Test, the Bankruptcy Code does not define "totality of the circumstances." In addition, there is little case law interpreting the phrase under BAPCPA. Prior to BAPCPA, the Ninth Circuit looked to the "totality of the circumstances" to interpret the term "substantial abuse" in former § 707(b).[7] *In re Price*, 353 F.3d 1135, 1139-40 (9th Cir. 2004). Because Congress retained the phrase "totality of the circumstances" in BAPCPA, the court may look to pre-BAPCPA case law to construe the meaning of that phrase under § 707(b)(3).

Presumption of Abuse. The UST contends that the Debtor's case is presumed to be an abuse of chapter 7 because the Debtor's annualized income greatly exceeds the applicable median family income and she has enough "disposable income" to pay at least $10,950 over 60 months. § 707(b)(2). The UST's analysis of the Means Test results in a monthly disposable income of $757 which would total about $45,440 over the course of a

---

[6]Section 707(b)(3) provides in pertinent part:

(3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(I) of such paragraph does not arise or is rebutted, the court shall consider–
    (A) whether the debtor filed the petition in bad faith; or
    (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse.

[7]Prior to BAPCPA, the court was required to find "substantial abuse" based solely on the "totality of the circumstances" test. The Bankruptcy Code also fixed a presumption *against* abuse in favor of the debtor. With the enactment of BAPCPA, the term "substantial" was deleted from the statute. BAPCPA also dropped the presumption in favor of the debtor. Because BAPCPA lowered the "abuse" standard, the former "substantial abuse" factors are still relevant to the new "abuse" inquiry.

60-month plan. The Debtor vigorously disagrees with the UST's analysis. Based on various amended schedules and Means Tests, she contends that she cannot support her family and pay anything to her unsecured creditors. However, the Means Test is a formula and the numbers which go into the Means Test are dictated by statute. The Debtor has made so many major adjustments to her Means Test, the court is not persuaded that the Debtor's Means Test accurately reflects her actual financial condition. The Means Test is meaningless if it does not reflect the Debtor's true financial condition. *See In re Marti*, 393 B.R. 697, 700 (Bankr. D.Neb. 2008).

<u>The "Totality of the Circumstances" of the Debtor's Financial Situation.</u> Sub-sections 707(b)(2) and (b)(3) are mutually exclusive. The court need not consider the Debtor's Means Test, or address the § 707(b)(2) argument summarized above, if it otherwise finds an abuse of chapter 7 under § 707(b)(3).

Section 707(b)(3) states that the court shall consider whether the totality of the circumstances of the debtor's financial situation demonstrates abuse when the presumption of abuse *does not* arise. *See In re Paret*, 347 B.R. 12 (Bankr. D.Del. 2006) (the term "shall" in § 707(b)(3) "explicitly mandates" consideration of the totality of the circumstances to determine whether abuse exists if the presumption of abuse under § 707(b)(2) does not arise or is rebutted); *see also* Eugene R. Wedoff, *Means Testing in the New § 707(B)*, 79 Am. Bankr. L.J. 231, 236 (2005) ("[B]ecause the general abuse provisions of § 707(b)(3) expressly apply when the means test has been rebutted, 'passing' the means test does not preclude a discretionary finding of abuse by the court. . . . [I]f a debtor's overall financial circumstances would easily allow the debtor to repay debts . . . the court may find abuse."). For the purposes of this analysis, the court can assume without deciding, that the Debtor "passes" the Means Test; *i.e.*, no "presumption of abuse" arises under § 707(b)(2). The Means Test analysis is inconsequential if the case is otherwise "abusive" under § 707(b)(3).

In *Price*, the Ninth Circuit prescribed some nonexclusive factors for courts to consider when reviewing the "totality of the circumstances" under § 707(b):

(1) Whether the debtor has a likelihood of sufficient future income to fund a Chapter 11, 12, or 13 plan which would pay a substantial portion of the unsecured claims;

(2) Whether the debtor's petition was filed as a consequence of illness, disability, unemployment, or some other calamity;

(3) Whether the schedules suggest the debtor obtained cash advancements and consumer goods on credit exceeding his or her ability to repay them;

(4) Whether the debtor's proposed family budget is excessive or extravagant;

(5) Whether the debtor's statement of income and expenses is misrepresentative of the debtor's financial condition; and

(6) Whether the debtor has engaged in eve-of-bankruptcy purchases.

*In re Price*, 353 F.3d at 1139-40.

The court in *Price* went on to state that the debtor's *ability* to repay his debts is the most important component for the determination of substantial abuse; "The primary factor defining substantial abuse is the debtor's *ability* to pay his debts *as determined by the ability to fund a Chapter 13 plan*. Thus, we have concluded that a 'debtor's *ability to pay his debts* will, standing alone, justify a section 707(b) dismissal.'" *Id.* at 1140 (quoting *Zolg v. Kelly, III (In re Kelly)*, 841 F.2d 908, 914 (9th Cir. 1988)) (emphasis added).

In the case at hand, the Debtor's amended schedule J shows a monthly net income of $195. At this rate, the Debtor would be able to pay $11,700 into a chapter 13 plan. This alone exceeds the amount which would trigger the "presumption of abuse" under § 707(b)(2). The court must also consider the fact that the Debtor has apparently deducted her car payment to the Credit Union twice; once on schedule I as part of a $680 voluntary payroll deduction in favor of the Credit Union and again on schedule J as a $487 secured debt payment for an automobile. Adding just the schedule J deduction back to the "monthly net income" calculation would increase that number to $682. Based on this adjustment alone it would appear that over 60 months the Debtor could pay approximately $40,920, an amount which exceeds 50% of her unsecured debts, to fund a

chapter 13 plan.[8] In the case of *In re Hebbring*, 463 F.3d 902 (9th Cir. 2006), the Ninth Circuit affirmed the dismissal of a chapter 7 case for *substantial* abuse where the debtor could afford to pay as little as 27% to her unsecured creditors over three years. *Id.* at 908-09.

Looking at this case objectively, the Debtor enjoys an income well above the state's median income. She has claimed generous deductions for many of her living expenses, including yard care, food, home maintenance, recreation, telephone service, and transportation. Even though the Debtor claims two dependents on schedule I and the Means Test, she only claimed one dependent on her 2007 Tax Return and that child is 20 years old. There is no evidence to suggest that the 20-year old child will be a long term obligation of the Debtor. As noted above, the Debtor has attempted to amend her Means Test so many times that the court finds the Means Test in this case to be inherently unreliable as an indicator of the Debtor's ability to pay her debts.

The Debtor states in her declaration, with no supporting evidence, that virtually of the unsecured debts were caused by her former spouse who is supposed to pay the debts pursuant to a marital settlement agreement. Presumably, the unsecured debts are community debts for which the Debtor and her former spouse are both liable under California law. Assuming this is true, and if the Debtor's former spouse is in default of a judgment order entered in a family law proceeding, then presumably the Debtor still has recourse against her former spouse in the state court. The marital settlement agreement does not exonerate the Debtor from personal liability to the creditors for the community debts.

**Conclusion.**

Based on the foregoing, the court is persuaded that the Debtor has the ability to repay a substantial portion of her unsecured debt through a chapter 13 plan. Her own

---

[8]The court is not making a finding here as to what amount must be paid into a chapter 13 plan. That review and analysis must be performed by the chapter 13 trustee who is not a party to this proceeding. *In re Baeza*, 398 B.R. 692, 697 (Bankr. E.D. Cal. 2008).

documents suggest that she can pay at least 50% of the scheduled unsecured debt and possibly more, depending on the necessity and reasonableness of her payroll deductions and stated living expenses. Accordingly, the court finds and concludes that a discharge in this case would be an abuse of chapter 7 under § 707(b)(3). The UST's motion to dismiss will be granted unless the Debtor voluntarily converts her case to chapter 13 and files a chapter 13 plan within 10 days from service of this ruling. If the case is not so converted, then the UST shall submit an order dismissing this case.

Dated: June __18__, 2009

W. Richard Lee
United States Bankruptcy Judge